IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MISTY DAWN EAGLE,

        Plaintiff,

v.                                                                                        Case No. 12-2166-JTM

CAROLYN W. COLVIN,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## MEMORANDUM AND ORDER

This is an action reviewing the final decision of the Commissioner of Social Security denying the plaintiff, Misty Dawn Eagle, disability insurance benefits and supplemental security income payments. The matter has been fully briefed by the parties.

**I. Legal Standard**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The court should review the Commissioner's decision to determine only whether the decision was supported by substantial evidence and whether the Commissioner applied the correct legal standards. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lax v. Astrue*, 489 F.3d 1080,

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, replacing Michael J. Astrue, the former Commissioner of Social Security.

1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). It requires more than a scintilla, but less than a preponderance. *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004). Evidence is insubstantial when it is overwhelmingly contradicted by other evidence. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The court's role is not to reweigh the evidence or substitute its judgment for that of the Commissioner. *Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008). Rather, the court must determine whether the Commissioner's final decision is "free from legal error and supported by substantial evidence." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). The findings of the Commissioner will not be mechanically accepted. Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992). The court should examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision and, on that basis, determine if the substantiality of the evidence test has been met. *Glenn*, 21 F.3d at 984.

A claimant is disabled only if he or she can establish having a physical or mental impairment expected to result in death or last for a continuous period of twelve months that preventing engaging in substantial gainful activity. *Brennan v. Astrue*, 501 F. Supp.2d 1303, 1306-07 (D. Kan. Aug. 7, 2007) (citing 42 U.S.C. § 423(d)). The physical or mental impairment must be so severe that the individual cannot perform any of his or her past relevant work and cannot engage in other substantial gainful work existing in

the national economy, considering the individual's age, education, and work experience. 42 U.S.C. § 423(d).

Pursuant to the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether an individual is disabled. If at any step a finding of disability or non-disability can be made, the evaluation process ends. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989). At step one, the agency will find non-disability unless the claimant can show that he or she is not working at a "substantial gainful activity." At step two, the agency will find non-disability unless the claimant shows that he or she has a "severe impairment," which is defined as any "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment that enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled. If the claimant's impairment does not meet or equal a listed impairment in step three, the inquiry proceeds. Before continuing on to step four, the agency will assess the claimant's residual functional capacity (RFC). This RFC assessment is used to evaluate the claim at both step four and step five.

At step four, the agency assesses whether the claimant can do his or her previous work; the claimant must show that he or she cannot perform such work or is determined not to be disabled. If the claimant survives step four, the fifth and final step requires the agency to consider vocational factors (the claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing

3

other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 124 S. Ct. 376, 379–80 (2003).

The claimant bears the burden of proof through step four of the analysis. *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy. *Nielson*, 992 F.2d at 1120; *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The Commissioner meets this burden if the decision is supported by substantial evidence. *Thompson*, 987 F.2d at 1487.

## II. History of Case

On October 7, 2010, administrative law judge (ALJ) Melvin B. Werner issued his decision. R. at 21–33.[2] Eagle alleges that she has been disabled since March 24, 2008. R. at 21. Eagle meets the insured status requirements of the Social Security Act through September 30, 2012. R. at 23. At step one, the ALJ found that Eagle had not engaged in substantial gainful activity since Eagle's alleged onset date. *Id.* At step two the ALJ found that Eagle had the following severe impairments: obesity, degenerative disc disease of the lumbar spine, sleep apnea, depression, anxiety, and post-traumatic stress disorder (PTSD). *Id.* At step three, the ALJ determined that Eagle's impairments do not meet or equal a listed impairment. *Id.* After determining Eagle's RFC, the ALJ determined at step four that Eagle is unable to perform her past relevant work. R. at 31. At step five, the ALJ determined that Eagle could perform other jobs that exist in

---

[2]The record is attached to Dkt. 8 in several exhibits.

significant numbers in the national economy. *Id.* Therefore, the ALJ concluded that Eagle was not disabled. R. at 32.

Eagle claims the ALJ erroneously determined her RFC at step four of the process and that the ALJ erroneously evaluated step five of the sequential evaluation process. In her step four argument, Eagle claims the ALJ did not properly weigh the medical opinion of her treating doctor, the ALJ erred because he ignored the GAF score of 50 assigned by Dr. Pulcher, and the ALJ improperly picked and chose parts of the numerous medical opinions to support his conclusion. In her step five argument, Eagle asserts that the ALJ's question for the vocational expert at the hearing was improper because it left out the limiting effects of Eagle's mental impairments. Eagle argues that the ALJ erred by relying on the vocational expert's answer in his step five analysis.

The Commissioner argues that the ALJ's assessment of the medical opinion evidence is supported by substantial evidence. The Commissioner also argues that the ALJ's hypothetical question to the vocational expert included all of Eagle's credible limitations.

**III. The ALJ's RFC Findings Are Supported by Substantial Evidence**

According to SSR 96–8p, the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." The ALJ must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the

ALJ must explain why the opinion was not adopted. SSR 96–8p, 1996 WL 374184 at *7.[3] It is insufficient for the ALJ to only generally discuss the evidence, but fail to relate that evidence to his conclusions. *Cruse v. U.S. Dep't of Health & Human Servs.*, 49 F.3d 614, 618 (10th Cir. 1995). When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination. Such bare conclusions are beyond meaningful judicial review. *Brown v. Comm'r of the Social Security Admin.*, 245 F. Supp.2d 1175, 1187 (D. Kan. 2003).

The ALJ made the following RFC findings regarding Eagle:

> . . . claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that she can lift 20 pounds occasionally and 10 pounds frequently; can stand and/or walk about 6 hours out of an 8 hour workday, with normal breaks; can sit for about 6 hours out of an 8 hour workday, with normal breaks; and push and/or pull the same weights; except the claimant can only occasionally bend, stoop, squat, crouch, and perform bimanual overhead reaching; must have the opportunity to alternate positions every 30 minutes; and is moderately limited, defined as more than a slight limitation but still able to function satisfactorily, in her ability to understand, remember, and carry-out detailed instructions and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

R. at 26. Eagle argues that the ALJ's RFC is not supported by the evidence for several reasons, each of which the court addresses below.

*A. Evaluation of Dr. Leonard's Medical Opinion*

First, Eagle argues that the ALJ did not properly consider Dr. J. Sandra Leonard's medical opinion regarding her mental impairments. Dr. Leonard, Eagle's treating

---

[3]SSR rulings are binding on an ALJ. 20 C.F.R. § 402.35(b)(1); *Sullivan v. Zebley*, 493 U.S. 521, 530 n. 9 (1990); *Nielson v. Sullivan*, F.2d 1118, 1120 (10th Cir. 1993).

6

mental health provider, offered an opinion indicating that Eagle's mental condition would impose a significant number of marked and extreme limitations on her functioning. R. at 475–76.

A treating doctor's opinion should be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. 404.1527(c)(2). An ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If the answer to this question is "no," then the inquiry is complete. *Id.* If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. *Id.* In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. *Id.*

Even if the treating doctor's medical opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the factors provided in 20 C.F.R. 404.1527(c) and 416.927(c). *Id.* (citing to SSR 96–2p, 1996 WL 374188, at *4). These factors are (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's

attention which tend to support or contradict the opinion. *Id.* at 1301 (quotations omitted).

If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so. *Id*. "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.2002) (quotation and emphasis omitted). Further, when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physician's reports to see if they outweigh the treating physician's report, not the other way around." *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir.1995) (quotations omitted).

In his RFC conclusions, the ALJ stated that Eagle is "moderately limited . . . in her ability to understand, remember, and carry-out detailed instructions and get along with co-workers or peers without distracting them or exhibiting behavioral extremes." R. at 26. Although Dr. Leonard had noted Eagle's limitations in these areas, she had assessed them as "marked" and "extreme," rather than moderate. R. at 475–76. In his RFC, the ALJ did not adopt any of Dr. Leonard's many remaining assessed marked or extreme limitations. Ultimately, the ALJ found Dr. Leonard's opinion "less than persuasive" and gave it "little weight." In his opinion, the ALJ relied on many facts that contradicted Dr. Leonard's opinion regarding the severity of Eagle's mental limitations.

8

The court finds that the ALJ relied on substantial evidence in weighing Dr. Leonard's opinion this way.

In the ALJ's paragraph B assessment of Eagle's mental limitations during step three, he found that Eagle has only mild restriction in the activities of daily living. R. at 25. The ALJ relied on the fact that Eagle had alleged her limitations in daily living activities were attributable to her physical condition rather than her mental impairments. The ALJ also noted that in July of 2010, Eagle told Dr. Stanley Mintz, the consultative examiner, that she was able to perform all of her activities of daily living.

The ALJ found that Eagle's social functioning was subject to moderate difficulties. R. at 25. Eagle alleged that she must be accompanied when going to the store, which is allegedly the only place she goes. However, the ALJ pointed out that the record indicated Eagle was able to go to medical appointments and counseling alone. R. at 25. The ALJ also stated that despite Dr. Mintz's assertion that Eagle might have difficulty interacting with supervisors and co-workers, Eagle had not reported any problems getting along with others or dealing with authority. *Id.* As the ALJ also noted, Eagle indicated that her social limitations were primarily due to her alleged physical limitations. *Id.*

The ALJ also found only mild limitations in Eagle's concentration, persistence, or pace. *Id.* He relied on Dr. Mintz's narrative report, which stated that Eagle remains capable of understanding simple and intermediate instructions, as well as concentrating. The ALJ also referred to Dr. Robert Pulcher's psychological report, which

9

stated that Eagle was able to understand, remember instructions and pay attention during his evaluation. *Id.*

In evaluating Dr. Leonard's opinion, the ALJ pointed out that her treatment notes show that she saw Eagle for less than a year. R. at 30. The ALJ also stated that Dr. Leonard's treatment notes do not provide a basis for finding such limitations. *Id.* Also, as indicated by the ALJ, Dr. Leonard gave her opinion several months after the date the treatment notes ceased. *Id.* The ALJ stated that although the treatment notes reflect some deterioration in Eagle's condition immediately after her boyfriend committed suicide, the notes also show that her condition improved shortly thereafter. *Id.* Further, as indicated by the ALJ, there is no indication that Eagle's mental functioning remained deteriorated for at least twelve months. *Id.*

The ALJ gave significant weight to Dr. Mintz's narrative report because he found that it was consistent with his examination report and the longitudinal record. The court finds that the ALJ sufficiently explained how Dr. Mintz's narrative report outweighed Dr. Leonard's opinion. *See Goatcher*, 52 F.3d at 290. Essentially, Eagle's statements to Dr. Mintz, as well as her performance on his examination, showed her to be much less limited than Dr. Leonard had believed.

As part of Dr. Mintz's examination, he took several notes showing that Eagle's memory processes appeared intact. For example, he noted that she could give "an adequate social history and an adequate account of her circumstances" as well as "identify Amelia Earhart, John F. Kennedy, Albert Einstein, [and] Cleopatra, but not Martin Luther King, Jr., from history." Dr. Mintz administered Trails A and B tests,

which Eagle completed with zero errors, suggesting she had no visual/spatial cognitive impairments. Dr. Mintz also administered the MMPI-2 (Minnestoa Multiphasic Personality Inventory) test. He interpreted Eagle's results as presenting a "faking bad" profile," "in which the individual appears to be exaggerating symptoms of mental illness." The ALJ found that this undercut Eagle's own subjective claims regarding the extent of her mental limitations, upon which Dr. Leonard's medical opinion relied.

In Dr. Mintz's narrative summary, he noted that Eagle "can understand simple and intermediate instructions," but "may have some difficulty getting along with co-workers and supervisors due to mental illness symptoms." The ALJ found that this conclusion was in line with Dr. Mintz's examination notes, which stated that Eagle "exhibited symptoms of PTSD, depression, anxiety, and panic attack symptoms." Dr. Mintz also completed a medical source statement that indicated Eagle would experience limitations in responding to work situations or changes in routine. The ALJ found these conclusions unsupported by Dr. Mintz's examination and narrative, giving it little weight. The court finds the ALJ's opinion supported by substantial evidence in his weighing of Dr. Mintz's reports.

Dr. Leonard's medical source statement suggested that Eagle had extremely severe limitations, such as "no useful ability" to get along with others without exhibiting "behavioral extremes." R. at 476. Although her treatment notes indicate one incident over a nine-month period in which Eagle was rude to her house guests, the court agrees with the ALJ that the notes do not provide any basis for finding such an extreme limitation. Despite never describing socially inappropriate behavior or poor

11

grooming by Eagle in her notes, Dr. Leonard indicated she would have moderate inability to maintain "socially appropriate behavior" or adhere to basic standards of cleanliness. R. at 476. Dr. Leonard's statement says Eagle would be extremely limited in her ability to maintain attention and concentration for extended periods and carry out detailed instructions. But Dr. Mintz and Dr. Pulcher both gave contradictory opinions on these points.

The ALJ stated that although Eagle's medically determinable impairments reasonably could be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible. The court finds this statement well-supported. It explains the fundamental difference between the ALJ's RFC and Dr. Leonard's own conclusions: the ALJ found that Eagle may be limited in areas pointed out by Dr. Leonard, but that those limitations were not as severe as Dr. Leonard believed. Considering all the evidence, including Eagle's "faking bad" profile on the MMPI-2 test, the court finds the ALJ had substantial evidence to give Dr. Leonard's opinion little weight and he gave specific, legitimate reasons for doing so. *See Watkins*, 350 F.3d at 1300.

*B. Dr. Pulcher's GAF Score*

Eagle argues that the ALJ erred by not addressing Dr. Pulcher's assigning a GAF score of 50 to Eagle.[4] The court finds that the ALJ did not err in this respect.

---

[4]GAF (global assessment of functioning) scores can be found in the Diagnostic and Statistical Manual of Mental Disorders. The score in this case represents the following:

12

There is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision. SSR 06–03p, 2006 WL 2329939 at *6. The ALJ need not discuss every piece of evidence in the record; it is enough if the ALJ discusses the evidence supporting his decision, "the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).

Here, Dr. Pulcher's GAF score of 50 was neither uncontroverted nor significantly probative. *See Luttrell v. Astrue*, 453 Fed. Appx. 786, 792 (10th Cir. 2011) (stating ALJ's failure to consider GAF scores that were neither uncontroverted nor significantly probative did not merit reversal). First, Dr. Mintz's examination report, which the ALJ gave significant weight to, assigned a GAF score of 55 to Eagle, contradicting Dr. Pulcher's GAF score. A score of 55 is significantly different than a score of 50; the latter indicates serious symptoms or impairments, while the former indicates only moderate symptoms or impairments. *See* Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (4th ed., text revision, American Psychiatric Association 2000 at 34).[1] Dr. Mintz also noted that despite Eagle's low average intellect and limited attention span, she could perform simple clinical tests of memory and concentration, such as counting backwards by threes. R. at 482–83. Second, the ALJ discussed the narrative portions of Dr. Pulcher's opinion, which were not consistent with serious impairments. Dr. Pulcher

---

[1]  41-50: **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job) . . .

Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (4th ed., text revision, American Psychiatric Association 2000 at 34) (emphasis in original).

13

believed Eagle could understand and remember instructions and that most of her limitations were due to her physical complaints, which the ALJ found were not supported by the medical evidence. Third, once again, Eagle's MMPI-2 test results revealed an invalid profile that Dr. Mintz interpreted as Eagle "faking bad." All of these contradictory indications render Dr. Pulcher's GAF score of 50 unhelpful. The court finds that the ALJ's failure to mention Dr. Pulcher's GAF score was not erroneous, because the score was not significantly probative or uncontroverted. *See Clifton*, 79 F.3d at 1010.

   *C. Weight Given to the Various Medical Opinions*

Eagle argues that the ALJ arbitrarily played "pick and choose" with the medical opinions in order to support his opinion that she was not disabled. The court finds that the ALJ did not improperly second guess the doctors' opinions or pick and choose favorable parts of his report, for the following reasons.

The ALJ is under no obligation to take an all-or-nothing approach to medical opinions. The ALJ does not have to rely entirely on a doctor's opinion, nor is he limited to a simple choice of the medical opinions of record when he formulates the residual functional capacity. *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). It is the ALJ's duty to resolve conflicts in the medical evidence. *Casias v. Sec. of Health & Human Serv's.*, 933 F.2d 799, 801 (10th Cir. 1991). An ALJ may reject the portions of a medical opinion he finds are unsupported, while still assigning significant weight to the portions of the opinion that are better supported. *See Drummond v. Astrue*, 895 F. Supp. 2d 1117, 1137 (D. Kan. Sept. 10, 2012).

In this case, the ALJ had several different medical opinions to consider, and although they all generally agreed as to Eagle's depression and general anxiety diagnoses, the conclusions of her limitations covered a large spectrum. For example, Dr. Leonard's medical source statement found nine different categories under which she believed Eagle would be markedly or extremely limited. Dr. Mintz's medical source statement found one marked limitation, and it was in an area in which Dr. Leonard had found only moderate limitations. Dr. Lester Bland's psychiatric review stated that Eagle's mental impairments were not even severe and her limitations only mild. Given the wide variety of medical opinions in this case, the ALJ's opinion could not agree with them all.

The court finds that the ALJ adequately explained his reasons for weighing the different opinions. He evaluated all of the medical opinions in accordance with the appropriate standards, and he expressed the weight accorded to those opinions and the reasons for that weight. The ALJ's reasons are supported by substantial record evidence and Eagle has not shown error in the analysis.

Residual functional capacity is a finding specifically reserved to the Commissioner and the ALJ, not a claimant's doctors. *Chapo*, 682 F.3d at 1288–89. The Commissioner uses medical sources to "provide evidence" regarding several factors, including RFC, but the "final responsibility for deciding these issues is reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(2).

The ALJ may also rely on his or her own assessment of credibility in evaluating the plaintiff's claims. *See* SSR 96-7p, 1996 WL 374186. The ALJ's determination "must

15

contain specific reasons for the finding on credibility, supported by the evidence in the case record" and be "sufficiently specific" to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight. *Southard v. Barnhart*, 72 Fed. Appx. 781, 783 (10th Cir. July 28, 2003) (quoting SSR 96-7p, 1996 WL 374186 at *4 (1996)).

Here, the ALJ also relied on factors other than medical source opinions to assess Eagle's credibility. For example, the ALJ cited one treatment report by Dr. Timothy Gabbart—another treating physician—which noted that Eagle was refusing treatment for her allegedly painful knee. R. at 450. Dr. Gabbart observed that Eagle was trying to get disability and that he doubted she would submit to any treatment besides pain medications until she got her "[d]isability issue resolved." R. at 450. The next month, as the ALJ pointed out, Dr. Gabbart's notes reflect that Eagle said she had to use a cane to get around, but the doctor observed that "I just do not see that she is having that much pain when she walks in here." R. at 27, 448. As noted above in the analysis of the ALJ's treatment of Dr. Leonard's opinion, the ALJ's decision explained several reasons why Eagle's own allegations of her mental limitations were not credible.

The ALJ's decision reflects that he carefully assessed the relevant medical opinions regarding Eagle's functioning. As the ALJ indicated, Eagle's treatment records or consultative reports did not document limitations consistent with disability. The court affirms the ALJ's RFC assessment because it is supported by substantial evidence.

**IV. The ALJ's Hypothetical Question Included all of Eagle's Credible Limitations**

Eagle argues that one question the ALJ relied on in his finding no disability was improper because he omitted the marked and extreme mental limitations suggested by Dr. Leonard from the questions he asked the vocational expert. When the ALJ asked the vocational expert a hypothetical including all of Eagle's alleged limitations, the vocation expert testified she would be disabled. R. at 65.

Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision. *See Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (internal citations and quotation marks omitted). But the ALJ is only required to ask hypotheticals encompassing impairments that find support in the record. *See Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999) (hypothetical need only include limitations the ALJ finds credible; remanded for other reasons). The ALJ is not required to rely on the vocational expert's answer to a hypothetical question that included non-credible limitations. As long as the ALJ's hypothetical accounted for Eagle's credible complaints, it was proper.

As the court has already discussed above, the ALJ had substantial evidence to discard Dr. Leonard's suggested limitations from the RFC. He asked the vocational expert for her opinion regarding disability using a hypothetical that included all of the alleged limitations that he found credible and relied on the expert's answer in his finding Eagle not disabled. The court finds this procedure was proper and affirms the ALJ's step five findings.

17

**V. Conclusion**

Eagle had a fair hearing and a full administrative consideration in accordance with applicable statutes and regulations. Substantial evidence on the record as a whole supports the Commissioner's decision. Accordingly, the court affirms the Commissioner's decision for the reasons set forth above.

IT IS THEREFORE ORDERED this 8th day of July, 2013, that the present appeal is hereby denied. The court affirms the decision of the Commissioner.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE